IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 4:23CR54 |
| | ) | |
| CORTEZ DAYSHAWN BUMPHUS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S MOTION IN LIMINE TO PREVENT
ARGUMENTS RELATED TO JURY NULLIFICATION**

The United States of America, by and through its attorneys, Erik S. Siebert, United States Attorney for the Eastern District of Virginia, and Eric M. Hurt, Assistant United States Attorney, respectfully submits this Motion *in Limine* to preclude Defendants from presenting arguments, evidence, or testimony related to Virginia laws regarding marijuana, Defendants' beliefs about such laws, the possible legalization of marijuana, or any other attempt at jury nullification at the trial of this matter.

## I.    Factual Background

Federal law enforcement opened an investigation into LUX AUTO circa June 2021 after receiving information about large-scale drug trafficking activity at the business. Additionally, LUX AUTO was referenced in a separate open FBI investigation into a shooting incident that occurred on or about August 27, 2021, in Hampton, VA, where Hampton Police Division officers were targeted by gunfire. Defendants in this case were using LUX AUTO as a base of operations on the east coast whilst being supplied by Sources of Supply ("SoS") in California and elsewhere.

Video footage obtained from Technical Surveillance of LUX AUTO corroborated the storage of illegal drugs in multiple vehicles throughout the parking lot of LUX AUTO. This

surveillance also established that members of the organization were frequently armed with handguns and/or assault style weapons. These weapons were visible on the camera and were recorded. Technical Surveillance at storage units in Newport News also corroborated the storage of suitcases full of suspected illegal drugs off of the LUX AUTO lot.

Law enforcement utilized a wide range of investigative techniques over the course of this multi-year investigation, to include an expansive financial investigation that uncovered over $22,000,000 flowing in and out of various accounts belonging to or associated with the defendants and their associates, plus approximately $5,000,000 flowing between Peer to Peer ("P2P") accounts. Various methods of surveillance, controlled evidence purchases, covert-entry search warrants, airport interdictions, and Title-III wire and data intercepts largely contributed to the overall discovery of a successful, multi-faceted conspiracy to traffic thousands of pounds of illegal marijuana via commercial aircraft into the Commonwealth of Virginia.

Between March of 2022 and July 2023, the United States District Court for the Eastern District of Virginia approved approximately 15 initial and/or renewal Applications for Orders authorizing the interception of wire and/or electronic communications occurring over telephones utilized by various defendants. During the course of those interceptions, the communications of each defendant were, at times, intercepted and found to be facilitating or discussing the criminal activity of this criminal enterprise. Those communications, marked as "Pertinent" by monitors or reviewers, laid the foundation for a widespread conspiracy dating back approximately seven years.

Between August 17, 2020, and January 25, 2023, several monetary seizures occurred at various major airports in the Mid-Atlantic area. Of those seizures, a total of nearly $400,000 in U.S. currency (cash) was seized from members and/or associates of this criminal enterprise. This

2

currency was either derived from the sale of controlled substances or was intended for the purchase of distribution amounts of controlled substances, primarily being marijuana.

Between January 20, 2021, and August 24, 2023, several seizures of illegal marijuana and/or related contraband took place at major airports in the Mid-Atlantic area. To date, almost 1,000 pounds of illegal marijuana have been seized through targeted interdiction operations, many of which were developed through monitoring of the aforementioned Title-III wire and data intercepts. According to intercepted conversations and airline records between 2017 and 2024, the organization was trafficking as much as 1,000 pounds of marijuana per week into the Commonwealth of Virginia. This is corroborated by the fact that the organization spent more than $500,000 on air travel in support of the movement of marijuana from the SoS to the Commonwealth of Virginia.

The members of the organization had varying roles and responsibilities. The leaders of this drug trafficking operation engaged with the sources of supply outside the Commonwealth of Virginia and arranged for the purchase of large loads of marijuana that were then marked for transportation to the Eastern District of Virginia. The leaders would then instruct other members of the organization to arrange for couriers to fly to the SoS, deliver money to them, and then return to the Eastern District of Virginia with the marijuana. The leaders would then arrange for mid-level members of the organization to receive the marijuana from the couriers and distribute it to customers or have subordinate dealers sell the marijuana.

The leaders of the organization had lieutenants who were responsible for arranging for couriers to travel to the SoS to obtain the marijuana, for obtaining locations to store the marijuana, and for insuring the ultimate distribution of the marijuana. These lieutenants would sometimes travel to the SoS themselves or would accompany couriers on their travels. The lieutenants

supervised individuals who were responsible for distributing the marijuana and sometimes receiving the marijuana from the couriers as they returned from the SoS. These individuals at times were also expected to collect the proceeds from the sale of the marijuana.

The couriers would be contacted by members of the organization when the need for marijuana transportation arose. The couriers were provided with tickets to the SoS and usually two suitcases. The couriers would then be transported to various airports in the Eastern District of Virginia for flights to the SoS. The courtiers would take the suitcases, often filled with currency, and travel to the SoS. When the couriers arrived at their destination, they would be met by representatives from the SoS, and the suitcases would be filled with between 20 and 80 pounds of marijuana. The following day, the couriers would return to the Eastern District of Virginia with the suitcases full of marijuana. When the couriers arrived in the Eastern District of Virginia, members of the organization would either meet them at the airport or arrange for the couriers to Uber to a location where they would surrender the suitcases. The couriers were paid as much as $1,500.00 for these trips.

The organization possessed this rough structure of organization over a period of years. However, the role of the individuals in the organization was at times fluid. Organization members were often called upon to perform multiple roles. If a situation arose, a non-courier might be required to travel to the SoS to transport marijuana. Also, some members of the organization, in addition to their tradition role, might need to do paperwork for a flight, deposit drug proceeds into an account, or aid in the storage of marijuana.

## II.   Legal Standard

Pursuant to Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Evidence is relevant only if "it has any tendency to make a fact more or less probable

than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Furthermore, even relevant evidence is subject to exclusion when "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## III.    Argument

### A.    Any arguments related to the policy considerations of federal marijuana laws should be excluded because they are irrelevant.

Any arguments or evidence relating to the regulation of marijuana at the state level is irrelevant in the instant case because such information does not have the tendency to make a fact in this trial more or less probable and is not of consequence in determining the present action. Therefore, such evidence is irrelevant and should be excluded from this trial pursuant to Rules 401 and 402. The Fourth Circuit has previously held that "no other state's laws . . . are relevant to . . . the elements necessary to prove a violation of 21 U.S.C. § 846." *United States v. Wall*, No. 19-cr-0500, 2022 WL 1268061, at *4 (D. Md. Apr. 28, 2022) (citing *United States v. Haymon*, No. 20-4438, 2021 WL 4495813 (4th Cir. Oct. 1, 2021)). Similarly, any arguments related to pending federal marijuana legislation and other policy considerations also are irrelevant to the probability of the facts at issue in the instant case and should be excluded pursuant to Rules 401 and 402.

### B.    Any arguments related to the policy considerations of federal marijuana laws should be excluded because they will confuse or mislead the jury.

Even if the Court finds that policy arguments related to marijuana are relevant under Rule 401, the evidence's value is outweighed by the dangers of confusing the issues and misleading the jury; therefore, the evidence should be excluded from this trial pursuant to Rule 403. There is little value in any evidence related to the policy considerations of marijuana regulation or the national debate regarding the legalization of marijuana. It is undisputed that entering into a conspiracy to

distribute marijuana is illegal under federal law.  Consequently, there is no value in evidence relating to how the distribution of marijuana is regulated in other jurisdictions or discussed in policy debates.  On top of such evidence having no probative value, the evidence also carries a high risk of confusing the issues and misleading the jury.  The status of the federal law prohibiting conspiracy to distribute marijuana is not at issue in this case, and arguments related to the federal law in comparison to other marijuana regulations will only confuse the issues at hand.

Arguments related to marijuana regulation in other jurisdictions would make an impermissible implicit suggestion for jury nullification.  "Jury nullification occurs when the jury chooses to reject evidence or ignore law, thereby excusing a defendant's conduct 'because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.'"  *United States v. Jones*, No. 15-CR-324-F-1, 2016 WL 5818534, at *4 (E.D.N.C. Oct. 4, 2016) (quoting Black's Law Dictionary (10th ed. 2014)).  Defense counsel is restricted from encouraging the jury to refuse to apply the law and issue a verdict on grounds other than the facts presented at trial.  *See United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996).  Arguments concerning the policy considerations of federal legislation regarding the distribution of marijuana would suggest to the jury they ought to issue a verdict based on the social debate regarding the regulation of marijuana and not the facts of the case.  Such arguments are impermissible invitations for jury nullification and, therefore, must not be permitted.

Other courts have considered similar motions *in limine* and precluded policy arguments related to the legalization and decriminalization of marijuana due to their irrelevancy and jury nullification issues.  *See, e.g.*, *Wall*, 2022 WL 1268061, at *1, *4 (excluding evidence of any nonfederal jurisdiction's marijuana laws); *United States v. Apicelli*, No. 14-cr-012-01-JD, 2015

WL 3398139, at *1-2 (D.N.H. May 26, 2015) (excluding arguments, evidence, and questions about marijuana laws and possible legalization, medical use of marijuana, and other issues related to jury nullification); *United States v. Jenkins*, No. 1:14-cr-72, 2014 WL 12676280, at *5 (W.D. Mich. Aug. 20, 2014) ("[C]ompliance with the Michigan Medical Marihuana Act is not a defense in this case, and any evidence about Defendants' compliance with the state law or reasons they believed their conduct was lawful is irrelevant to the federal prosecution.").

## IV.  <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court limit the defendant from presenting arguments related to the legalization and decriminalization of marijuana in other jurisdictions and all other arguments regarding the policy considerations of federal marijuana regulations.

Respectfully submitted,

ERIK S. SIEBERT
UNITED STATES ATTORNEY

By:           /s/
Eric M. Hurt
Assistant U.S. Attorney
Attorney for the Government
United States Attorney's Office
One City Center
11815 Fountain Way, Suite 200
Newport News, VA 23606
Ph: 757-591-4034
Email: EHurt@usa.doj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on June 22, 2025, I electronically filed a copy of the foregoing with the clerk

of the court using the CM/ECF system, which will send a notification of such filing to all counsel

of record. In addition, the United States mailed a copy to:

Kamani Johnson
Western Tidewater Regional Jail
2402 Godwin Blvd,
Suffolk, VA 23434

                              _____/s/_____
                              Eric M. Hurt
                              Assistant United States Attorney